**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*Pro hac vice* Forthcoming)
Julian C. Diamond (*Pro hac vice* Forthcoming)
888 Seventh Ave, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: pfraietta@bursor.com
            jdiamond@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAMMAD AL-RAMAHI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PAYPAL, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    Plaintiff Mohammad Al-Ramahi ("Plaintiff"), individually and on behalf of all others

2  similarly situated, brings this Class Action Complaint ("Complaint") against Defendant PayPal, Inc.

3  ("PayPal" or "Defendant"), based upon personal knowledge with respect to himself, and on

4  information and belief and the investigation of counsel as to all other matters.  In support thereof,

5  Plaintiff alleges as follows:

6                                          **INTRODUCTION**

7        1.      This lawsuit is brought as a class action on behalf of Plaintiff and thousands of

8  similarly situated customers of PayPal who signed up for Defendant's Venmo money transfer

9  service ("Venmo"), and who have been the victim of fraud on Venmo, have incurred losses due to

10 that fraud and have not been reimbursed by PayPal, and were entitled to such reimbursement by

11 federal regulations and the marketing representations of PayPal.

12       2.      Venmo is a person-to-person money transfer application ("Transfer App") owned

13 and operated by Defendant.

14       3.      Defendant markets Venmo as a safe way for consumers to send money.  This is false.

15 In fact, there are huge, undisclosed security risks of using Venmo that Defendant omitted from its

16 marketing push to get its customers to sign up for Venmo.

17       4.      Defendant misrepresents and omits a key fact about the service that is unknown to

18 accountholders: that there is virtually no recourse for consumers to recoup losses due to fraud.

19 Indeed, unlike virtually every other payment method commonly used by American consumers—

20 debit cards, credit cards, and checks—there is no protection for accountholders who are victims of

21 fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

22       5.      Defendant informs accountholders that Venmo is "safe."[1]

23       6.      The unique, misrepresented, and undisclosed architecture of the Venmo payment

24 system means that virtually any money transferred for any reason via Venmo is gone forever,

25 without recourse, reimbursement, or protection, unlike other payment options commonly used by

26 American consumers.

27       7.      Worse, Defendant misrepresents and omits the truth about a secret policy it has

28
_____
[1] https://venmo.com/ (last accessed June 20, 2022).

adopted: it does not and will not reimburse its accountholders for losses on Venmo due to fraud, even where those losses are timely reported by accountholders.

8.     Defendant was required to not misrepresent the unique and dangerous features of the Venmo service in its marketing and in contractual representations. But it failed to do so.

9.     As a result, users like Plaintiff sign up for and use the Venmo service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due to fraud.  Such users never would have signed up for Venmo in the first place if they had known the risks of signing up for and using the service.

10.     These risks are well known to Defendant but are omitted from all of its marketing regarding Venmo.

11.     As a recent New York Times investigation showed, fraud on Transfer Apps is a widespread scourge of which Defendant is well aware. Quoting an industry expert, the *Times* reported:

> "Organized crime is rampant," said John Buzzard, Javelin's lead fraud analyst. "A couple years ago, we were just starting to talk about it" on apps like Zelle and Venmo, Mr. Buzzard said. "Now, it's common and everywhere."
>
> The banks are aware of the widespread fraud on Zelle. When Mr. Faunce called [his bank] to report the crime, the customer service representative told him, "A lot of people are getting scammed on Zelle this way." Getting ripped off for $500 was "actually really good," Mr. Faunce said the rep told him, because "many people were getting hit for thousands of dollars."

https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last accessed May 25, 2022).

12.     Had Plaintiff and the Class members known of the true operation and risks of the Venmo service—risks Venmo was aware of and actively misrepresented—they would not have signed up for and used the Venmo service.

13.     Plaintiff and the Class members have been injured by signing up for and using the Venmo service.  Plaintiff brings this action on behalf of himself, the putative Class, and the general public.  Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of

the general public to prevent Defendant from continuing to engage in its illegal practices as described herein.

## PARTIES

14.     Plaintiff Mohammad Al-Ramahi ("Plaintiff") is a citizen and resident of San Jose, California.  Plaintiff is a Venmo accountholder.  Due to fraud, Plaintiff lost $2,450 on the Venmo app in April 2020.  When Plaintiff attempted to obtain a refund of these fraudulent charges, Defendant refused to cover the transactions.  When Plaintiff signed up for Venmo, he was not informed that Venmo's service had a significant "catch" and that considerable monetary losses could result from signing up for the service—or that those losses are almost never reimbursed by Defendant.

15.     Defendant PayPal, Inc. is a Delaware corporation with its principal place of business in San Jose, California.  Defendant is a financial institution or servicer as defined by the EFTA, 15 U.S.C. § 1693(a)(9).  Defendant owns and operates the Venmo app that is at issue in this case.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of each of the Classes is a citizen of a State different from the Defendant.  The number of members of the proposed Classes in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

17.     This Court has personal jurisdiction over the Defendant because Defendant maintains its principal place of business in this district.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.     Overview

18.     It is free to sign-up with Venmo. During that sign-up process, a user provides basic information to Defendant in order for the user to link his or her bank account with the Venmo app.

19.     Signing up for the Venmo service allows the fast transfer of a user's account funds to other Venmo users.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    3

20.     In 2021, users sent $230 billion in immediate payment transfers through Venmo.

21.     The Venmo service is very popular, but it also has a massive fraud problem—in no small part because of the immediacy with which money transfers are made on the service. If a fraudster removes money from a Venmo user's bank account, either directly or by fooling the Venmo user to transfer money, those funds are unrecoverable to the consumer.

22.     Nearly 18 million Americans were defrauded through scams involving person-to-person payment apps like Venmo in 2020 alone, according to Javelin Strategy & Research, an industry consultant.

23.     Organized crime is rampant on Venmo and other similar person-to-person money transfer services.

24.     Financial institutions, including Defendant, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take reasonable steps to warn their accountholders of these risks—or to protect their accountholders who fall prey to fraud.

25.     For example, a common scam involves a scammer impersonating a bank employee and requesting that the accountholder transfer money to a different bank account for testing purposes. In many cases, unsuspecting Venmo users, tricked into making a fraudulent transfer, send hundreds or thousands of dollars to fraudsters.

26.     In another very common scheme, a Venmo user's phone is stolen and Venmo transfers are made from the stolen phone to the fraudster.

27.     Yet another common scheme involves posting a fake employment advertisement online to which victims respond. The victims will quickly be "hired" and told that part of their duties will include paying for goods and supplies. The victims will be sent a check and then quickly told to complete transaction requests on Venmo. Only after the check bounces a few days later will the victim realize that they have been defrauded. It was this type of scam to which Plaintiff fell victim.

28.     In short, and unbeknownst to average Venmo users, the Venmo network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists, and those who

1    use social media sites to advertise fake concert tickets and purebred puppies.

2         29.    Scams like these are rampant on the Venmo network precisely because of the design

3    and architecture of the network, specifically that a money transfer is instantaneous and

4    unrecoverable.  Indeed, there is virtually no recourse for consumers to recoup losses due to fraud,

5    unlike other payment methods commonly used by American consumers—debit cards, credit cards,

6    and checks.  Venmo provides no protection for accountholders who are victims of fraud, and

7    Defendant provides virtually no recourse for accountholders attempting to recoup losses due to

8    fraud.

9         30.    The unique, misrepresented, and undisclosed architecture of the Transfer App

10   payment systems and Defendant's own fraud policies means—again, unlike other payment options

11   commonly used by American consumers—that virtually any money transferred for any reason via a

12   Transfer App is gone forever, without recourse, reimbursement, or protection for victimized

13   accountholders.

14   **B.    Defendant Falsely Markets Venmo as a Safe Way to Transfer Money and
     Omits Information Regarding the Extreme Risks of Signing Up for and Using**

15   **the Service**

16        31.    Defendant states that Venmo is a way to make "Fast, **safe**, social payments"

17   (emphasis added).

18        32.    At no time in its marketing or during the sign-up process does Defendant reasonably

19   warn potential users of the true security risks of using the Venmo service—including the risk of

20   fraud and the risk that fraudulent losses will never be reimbursed by Defendant.

21        33.    Venmo's services can cause unsuspecting consumers like Plaintiff to incur massive

22   losses on their linked bank accounts.

23        34.    Defendant misrepresents and omits facts about the true nature, benefits, and risks of

24   the Venmo service, which means that users are at extreme and undisclosed risk of fraud when using

25   Venmo.  Had Plaintiff been adequately informed of these risks, he would not have signed up for or

26   used Venmo.

27        35.    Defendant's marketing representations about Venmo—including within its app and

28   website—misrepresent and never disclose these risks and material facts, instead luring

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                                 5

1   accountholders to sign-up for and use the service with promises of ease, safety, and security.

2      36.   These representations—which all users view during the sign-up process—are false

3   and contain material omissions.

4      37.   Defendant misrepresents the true nature, benefits, and risks of the service, which

5   burden users with an extreme and undisclosed risk of Venmo causing losses due to fraud.  Plaintiff

6   would not have used Venmo if he had been adequately informed of the risks.

7      38.   Defendant's misrepresentations and omissions are especially pernicious because

8   Defendant alone knows a crucial fact regarding Venmo transfers that occur on its customers'

9   accounts: as a matter of secret bank policy, fraudulently-induced Venmo transfers will almost never

10   be reimbursed to accountholders.

11      39.   Indeed, PayPal maintains a secret policy whereby it refuses to reimburse fraud losses

12   incurred via Venmo, even where its accountholders timely inform Defendant of the fraud.

13      40.   Defendant misrepresents and fails to disclose this secret policy.

14      41.   Further, Venmo's Help center implies to users that if they "Report any unauthorized

15   payments or activity to Venmo," that Venmo will take action.[2]

16      42.   These provisions are and were reasonably understood by Plaintiff to mean that

17   Plaintiff would not be liable for electronic funds transfers effectuated by fraud.

18      **C.   Defendant is Legally Required to Cover Unauthorized Fraudulent Transactions**

19      43.   The Electronic Fund Transfer Act ("EFTA") and Regulation E apply to an electronic

20   fund transfer that authorizes a financial institution to debit or credit a consumer's account. 12 CFR

21   1005.3(a).

22      44.   The term "electronic fund transfer" or "EFT" means any transfer of funds that is

23   initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of

24   ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account.

25   12 CFR 1005.3(b)(1).

26      45.   Accordingly, Regulation E applies to any person-to-person (P2P) or mobile payment

27

28   [2] https://help.venmo.com/hc/en-us/articles/4410324103187-Reporting-Fake-or-Suspicious-Emails- (last accessed June 20, 2022).

transactions that meet the definition of EFT, including debit card, ACH, prepaid account, and other electronic transfers to or from a consumer account. 12 CFR 1005.3(b)(1)(v); Comment 3(b)(1)-1.ii.

46.     According to the Consumer Financial Protection Bureau ("CFPB"), "Person-to-person" or "P2P" payments allow a consumer to send money to another person without needing to write a check, swipe a physical card, or exchange cash.  Depending on the payment provider, a P2P payment can be initiated from a consumer's online bank account portal, prepaid account portal, or mobile application.  Any P2P payment that meets the definition of EFT is covered by EFTA and Regulation E."[3]

47.     Any P2P payment provider can be a financial institution under Regulation E.  Thus, if a P2P payment provider directly or indirectly holds an account belonging to a consumer, they are considered a financial institution under Regulation E. 12 CFR 1005.2(i).[4]

48.     If a consumer notifies a financial institution within two business days after learning of a loss due to an unauthorized transfer, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.  12 C.F.R. § 1005.6(b)(1).

49.     Even if the consumer fails to notify the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $500 or the sum of: (i) $50 or the amount of unauthorized transfers that occur within the two business days, whichever is less; and (ii) [t]he amount of unauthorized transfers that occur after the close of two business days and before notice to the institution, provided the institution establishes that these transfers would not have occurred had the consumer notified the institution within that two-day period. 12 C.F.R. § 1005.6(b)(2).

50.     If the consumer's delay in notifying the financial institution was due to extenuating circumstances, the institution shall extend the times specified above to a reasonable period.  12 C.F.R. § 1005.6(b)(4).

51.     The CFPB has made it clear that a transaction that is fraudulently induced by a third

---

[3] https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/ (last accessed May 25, 2022).
[4] *Id.*

party is an unauthorized electronic funds transfer subject to the limitations of liability in 12 C.F.R. § 1005.6.[5]

52.     "Negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E."[6]

53.     A separate regulation, Regulation Z, also requires Defendant to cover extensions of credit that are "not made to the consumer or to a person who has actual, implied, or apparent authority to use the consumer's credit card or open-end credit plan."  12 C.F.R. § 1026.13(a)(1).

54.     Because of the failure of Transfer Apps to cover fraudulently induced transactions. Senators Robert Menendez and Elizabeth Warren sent a letter to the CEO of a Transfer App noting:

> The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money transfers, **including those who were "induced" into transferring the money themselves**, while the FDIC issued a report in March 2022 finding that both the banks and the platform … were held responsible for fraudulent electronic transfers through Regulation E.

*See* **Exhibit 1**, Menendez Letter Regarding Scams and Fraud (emphasis added).

**D.     Plaintiff's Experience**

55.     In April 2020, Plaintiff responded to a job posting about an "Admin Position" on indeed.com.

56.     On April 18, 2020, Plaintiff received an email from someone identifying themselves as Mark Moton, stating that Plaintiff was to be expected to carry out various duties, including paying for goods and supplies.  Plaintiff was told that the payment was to be arranged with the CFO, who was to mail the payment to Plaintiff, and which Plaintiff would be required to use to pay for supplies.

57.     On April 21, 2020, Plaintiff received a check for $4,950, which he deposited into his bank account.

---

[5] https://www.consumerfinance.gov/rules-policy/regulations/1005/2/#m ("An unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through fraud") (last accessed May 25, 2022).
[6] https://www.consumerfinance.gov/rules-policy/regulations/1005/interp-6/#6-a-Interp-1-ii (last accessed May 25, 2022).

58.     On April 24, 2020, the job offeror initiated two fraudulent transactions including one for $2,450 by requesting that Plaintiff send that amount using the Venmo app linked to his bank account.

59.     Plaintiff dutifully completed both transactions as part of what he thought was his new job.

60.     Unbeknownst to Plaintiff, the job offer was fraudulent and he had fallen victim to a scam that caused him to lose $4,950, including $2,450 via Venmo.

61.     Plaintiff was not aware that he had been defrauded until April 28, 2020, when his bank informed him that the check that he had deposited was altered/fictitious.  As a result, $4,962.00 was deducted from Plaintiff's bank account, $4,950 of which was the amount of the returned item, and $12.00 of which was for a return items fee.

62.     At this point, Plaintiff was distraught and desperately attempted to recover his badly needed funds.

63.     On the same day, he contacted Venmo to explain that he was the victim of fraudsters who had taken $2,450 of his money on Venmo without his authorization.

64.     Plaintiff also filed a police report with the San Jose Police Department and left a complaint with the Internet Crime Complaint Center.

65.     Venmo refused to cover the transactions in question or help Plaintiff in any manner whatsoever.

## CLASS ALLEGATIONS

66.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

67.      The proposed classes are defined as:

**The Nationwide Class**
>     All persons who incurred unreimbursed losses due to fraud on
>     Venmo (the "Nationwide Class").

**The California Subclass**

> All California persons who incurred unreimbursed losses due to
> fraud on Venmo (the "California Subclass").

The Nationwide Class and California Subclass are collectively referred to as the "Classes."

68.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

69.     Specifically excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

70.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of hundreds of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Defendant's records.

71.     The claims of the representative plaintiff are typical of the claims of the Classes in that the representative plaintiff, like all members of the Classes, was similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the members of the Classes, was deprived of monies that rightfully belonged to him.  Further, there are no defenses available to Defendant that are unique to Plaintiff.  Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

72.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

73.     The questions of law and fact common to the Classes include:

      a.   Whether Defendant's representations and omissions about Venmo are false, misleading, deceptive, or likely to deceive;

      b.   Whether Defendant failed to disclose the risks of using the Venmo service;

c.   Whether Plaintiff and the Class members were damaged by Defendant's conduct;

d.   Whether Defendant's actions or inactions violated the consumer protection statues invoked herein;

e.   Whether these practices violated California and federal law;

f.   The proper method or methods by which to measure damages;

g.   Whether Defendant is legally required to cover transactions that Plaintiff and Class members were fraudulently induced to enter into; and

h.   The declaratory, injunctive, and other equitable relief to which the Classes are entitled.

74.   Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

75.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of PayPal, no class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

76.   Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

77.   Plaintiff suffers a substantial risk of repeated injury in the future.  Plaintiff, like all members of the Classes, is at risk of being victimized by future fraudulent transactions that

1   Defendant will refuse to cover.  Plaintiff and the members of the Classes are entitled to injunctive

2   and declaratory relief as a result of the conduct complained of herein.  Money damages alone could

3   not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant

4   from continuing to commit its unfair and illegal actions.

5       78.   Defendant has acted or refused to act on grounds generally applicable to the Classes,

6   thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to

7   the Classes as a whole.

8                              **CAUSES OF ACTION**

9                                   **COUNT I**
        **Breach Of Contract and Breach of the Covenant Of Good Faith And Fair Dealing**
10                          **(On Behalf Of The Classes)**

11      79.   Plaintiff incorporates by reference each of the allegations set forth in the preceding

12   paragraphs.

13      80.   Plaintiff brings this claim on behalf of the Classes.

14      81.   Plaintiff and members of the Classes contracted with Defendant.

15      82.   Defendant breached the terms of its contract with consumers when, as described

16   herein, Defendant failed to fairly investigate reported fraudulent transactions on Venmo and failed

17   to reimburse accountholders for fraud-induced losses incurred from using Venmo.

18      83.   Further, under the law of each of the states where Defendant does business, an

19   implied covenant of good faith and fair dealing governs every contract. The covenant of good faith

20   and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

21      84.   This good faith requirement extends to the manner in which a party employs

22   discretion conferred by a contract.

23      85.   Good faith and fair dealing, in connection with executing contracts and discharging

24   performance and other duties according to their terms, means preserving the spirit—not merely the

25   letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply

26   with the substance of their contract in addition to its form.  Evading the spirit of the bargain and

27   abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

28      86.   Subterfuge and evasion violate the obligation of good faith in performance even

1  when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist

2  of inaction, and fair dealing may require more than honesty. Other examples of violations of good

3  faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify

4  terms, and interference with or failure to cooperate in the other party's performance.

5      87.     Defendant breached the covenant of good faith and fair dealing when it failed to

6  fairly investigate reported fraudulent transactions on Venmo and failed to reimburse accountholders

7  for fraud-induced losses incurred using Venmo.

8      88.     Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

9      89.     Plaintiff and members of the Classes have performed all of the obligations imposed

10  on them under the contract.

11      90.     Plaintiff and members of the Classes have sustained monetary damages as a result of

12  Defendant's breaches of the contract and the covenant of good faith and fair dealing.

13                                      **COUNT II**
                         **Violation of California Unfair Competition Law**
14                       **Business and Professions Code § 17200**
                                  **(On Behalf of the Classes)**
15

16      91.     Plaintiff incorporates by reference each of the allegations set forth in the preceding

17  paragraphs.

18      92.     Plaintiff brings this claim on behalf of the Classes.

19      93.     Defendant's conduct described herein violates the Unfair Competition Law (the

20  "UCL"), codified at California Business and Professions Code section 17200, *et seq.*

21      94.     The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose

22  is to protect both consumers and competitors by promoting fair competition in commercial markets

23  for goods and services. In service of that purpose, the Legislature framed the UCL's substantive

24  provisions in broad, sweeping language.

25      95.     By defining unfair competition to include any "any unlawful, unfair or fraudulent

26  business act or practice," the UCL permits violations of other laws to be treated as unfair

27  competition that are independently actionable, and sweeps within its scope acts and practices not

28  specifically proscribed by any other law.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

96.     The UCL expressly provides for injunctive relief, and also contains provisions denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory damages for his own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair competition.

97.     As alleged herein, Defendant's conduct violates the UCL's "unfair" prong insofar as Defendant regularly:

     a.  Knowingly and intentionally makes false or misleading representations that it provides "safe" money transfer service through its website and mobile app;

     b.  Knowingly  and intentionally conceals and fails to disclose material facts regarding the true risks of utilizing the Venmo money transfer service through its website and mobile app;

     c.  Deceives reasonable consumers, who expect financial institutions to fully investigate and protect against fraudulent losses incurred using Venmo; and

     d.  Omits the security risks of using the Venmo service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Defendant, as a matter of secret policy.

98.     As alleged above, Defendant's conduct also violates the UCL's "unlawful" prong insofar as Defendant regularly refuses to cover transactions that Plaintiff and class members were fraudulently induced to enter into despite being required to by federal and state regulations.

99.     Defendant's conduct was not motivated by any legitimate business, economic need, or rationale.  The harm and adverse impact of Defendant's conduct on members of the general public were neither outweighed nor justified by any legitimate reasons, justifications, or motives.

100.    The harm to Plaintiff and members of the Classes arising from Defendant's unfair and unlawful practices outweighs the utility, if any, of those practices.

101.    Defendant's unfair and unlawful business practices as alleged herein are immoral,

unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff, members of the Classes, and the general public.

102.    Defendant's conduct was substantially injurious to consumers in that they have suffered monetary injury on the Venmo app.  Had Plaintiff known the true risks of using the Venmo service, he never would have signed up for and used the Venmo service.

103.    Moreover, Defendant committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly stated that it provides "safe" money transfer services through its website and mobile app.  Such representations misled the Plaintiff and are likely to mislead the public.  Additionally, Defendant willfully and intentionally concealed and omitted the security risks of using the Venmo service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Defendant.  As a matter of secret policy, this is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

104.    Plaintiff relied on Defendant's misrepresentations and material omissions. Specifically, Plaintiff had no idea that Defendant would refuse to cover fraudulent transactions. If Plaintiff knew Defendant would not cover fraudulent transactions, he would have not used the Venmo service. Such misrepresentations and omissions misled Plaintiff and are likely to mislead the public. Plaintiff seeks to enjoin Defendant from misrepresenting and/or omitting this material and accurate information in the documents that it makes available to existing customers and the general public who might consider using Venmo.

105.    Plaintiff and members of the Classes relied on Defendant's misrepresentations and omissions in that Plaintiff received and reviewed the materials provided by Defendant, and like any reasonable customer, understood these documents to mean that in the event he was the victim of a fraudulent transaction, Defendant would cover the transaction.  Had Plaintiff and others been informed in any of the documents provided by Defendant that they would be subject to these practices, they would not have used Venmo.

106.    Moreover, Defendant committed unlawful business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it violated the CLRA, as alleged herein.

107.     Defendant also committed unlawful business acts and practices in violation of Regulation E and Regulation Z, when it violated those regulations, as alleged herein.

108.     As a result of Defendant's violations of the UCL, Plaintiff and members of the Classes have suffered, and/or will continue to suffer from Defendant's unfair and unlawful policies, and thereby have suffered and will continue to suffer actual damages.

109.     Absent injunctive and public injunctive relief prohibiting Defendant from misrepresenting and omitting material information concerning its unfair policies at issue in this lawsuit, Plaintiff and other existing accountholders, and the general public will be exposed to Defendant's conduct violative of the UCL.

<u>COUNT III</u>
**Consumer Legal Remedies Act (CLRA) Cal. Civ. Code 1750 *et seq.*
(On Behalf Of The Classes)**

110.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

111.     Plaintiff brings this claim on behalf of the Classes.

112.     Plaintiff and each of the members of the Classes are "consumers" within the meaning of Civil Code § 1761(d).

113.     Plaintiff and Class members engaged in "transactions" with Defendant within the meaning of Civil Code § 1761(e).

114.     Defendant's payment services are "services" within the meaning of § 1761(b).

115.     Defendant's actions, representations, and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or that have resulted, in the sale of goods or services to any consumer.

116.     The CLRA expressly provides for injunctive relief, and also contains provisions denoting its public purpose. A claim for injunctive relief under the CLRA is brought by a plaintiff acting in the capacity of a private attorney general.

117.     As detailed above, Defendant has engaged, and continues to engage, in unfair methods of competition and has undertaken unfair or deceptive acts or practices in violation of the CLRA by, inter alia:

a. Knowingly and intentionally making false or misleading representations that it provides "safe" money transfer service through its website and mobile app;

b. Knowingly and intentionally concealing and failing to disclose material facts regarding the true risks of utilizing the Venmo money transfer service through its website and mobile app;

c. Deceiving reasonable consumers, who expect financial institutions to fully investigate and protect against fraudulent losses incurred using the Venmo service; and

d. Omitting the security risks of using the Venmo service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Defendant as a matter of secret policy.

118. Defendant made material misrepresentations and/or omissions concerning each of these practices upon which Plaintiff relied.

119. Such misrepresentations and omissions misled Plaintiff and are likely to mislead the public. Plaintiff seeks to enjoin Defendant from misrepresenting and/or omitting this material and accurate information in the documents that it makes available to the public.

120. Plaintiff and members of the Classes relied on Defendant's misrepresentations and omissions in that Plaintiff received and reviewed the materials provided by Defendant. Had Plaintiff been informed in any of the documents provided by Defendant that he would be subject to these unfair practices, he would have been able to weigh the convenience and benefits in engaging in transactions against the cost of the risks associated with using Venmo.

121. Plaintiff and the members of the Classes are injured in fact and have lost money as a direct and proximate result of Defendant's unfair methods of competition and/or deceptive acts or practices in that they incurred fees that were improper.

122. Plaintiff and the members of the Classes seek declaratory relief, injunctive relief, and all other relief allowable under Bus. & Prof. Code § 17203, including but not limited to enjoining Defendant from continuing to engage in the unfair, unlawful, and fraudulent conduct alleged herein.

123. As a result of Defendant's violations of the CLRA, Plaintiff and members of the

1   Classes have paid, and/or will continue to pay improperly charged fees and thereby have suffered

2   and will continue to suffer actual damages.

3   124.    Absent injunctive and public injunctive relief prohibiting Defendant from

4   misrepresenting and omitting material information concerning its policies at issue in this lawsuit,

5   Plaintiff and other existing accountholders, and the general public will be exposed to Defendant's

6   conduct violative of the CLRA.

### COUNT IV
### Violation of The Electronic Fund Transfers Act, 15 U.S.C. § 1693 et seq.
### (On Behalf of the Classes)

9   125.    Plaintiff incorporates by reference each of the allegations set forth in the preceding

10  paragraphs.

11  126.    Plaintiff brings this claim on behalf of himself and members of the Classes.

12  127.    The fraudulent transfers described above, including the $2,450.00 that the fraudsters

13  made using Plaintiff's Venmo account, are electronic funds transferred as defined under the EFTA.

14  128.    Per the EFTA, Regulation E, and Regulation E's Official Interpretations, Defendant

15  bears the financial responsibility for these unauthorized transfers.

16  129.    The EFTA caps consumer liability for unauthorized electronic fund transfers at $50

17  and the transactions at issue exceed that amount. 15 U.S.C. § 1693g(a).

18  130.    Defendant has violated the EFTA by refusing to cover the aforementioned

19  unauthorized transfers, in violation of the EFTA's sharp limitation on consumer liability.

20  131.    Moreover, once Plaintiff and class members notified Defendant that they disputed

21  the unauthorized transfers and withdrawals, Defendant was required to conduct a bona fide

22  reasonable investigation to determine if fraud occurred.

23  132.    However, Defendant failed to conduct a reasonable investigation.

24  133.    For example, a reasonable investigation of Plaintiff's situation would have included

25  review of one or more of the following items, which would have led Defendant to conclude that

26  fraud had occurred:

27          a.   Historical information on the customer's pattern of use (e.g. time, frequency,

28               location, and types and amounts of transactions);

    b. Complaints to the FTC and CFPB; and

    c. Plaintiff's Police report.

134. Furthermore, a reasonable investigation would have revealed, inter alia, the following:

    a. Plaintiff did not authorize the disputed transaction;

    b. Plaintiff promptly reported the fraudulent transaction;

    c. Plaintiff filed a police report concerning the fraudulent transaction;

    d. Plaintiff has no criminal history; and

    e. Plaintiff has no history of fraud with Defendant or any other financial institution.

135. Moreover, the EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. § 1693g(b).

136. This burden of proof cannot be and was not plausibly met with regard to the contested transactions and Defendant could not have plausibly concluded that the transfers were authorized.

137. In short, any reasonable investigation of these transactions would have resulted in Defendant cancelling transfers and crediting Plaintiff's account for the stolen funds.

138. Defendant's acts and omissions set forth above constitute violations of the EFTA.

139. As a direct and proximate result of Defendant's violations of the EFTA, Plaintiff and class members are entitled to an award of statutory and actual damages as well as attorney's fees and costs.

140. Defendant did not conduct a good faith investigation regarding the stolen funds.

141. Defendant did not have a reasonable basis for believing the accounts were not in error.

142. Defendant willfully concluded that Plaintiff and class member's accounts were not in error when such a conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of the investigation.

143.    In light of the foregoing – in addition to all other relief sought herein – Plaintiff is also entitled to recover treble damages under Section 1693f(e).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b)    For compensatory, statutory, and punitive damages on all applicable claims and in an amount to be proven at trial;

(c)    For restitution on all applicable claims and in an amount to be proven at trial;

(d)    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

(e)    For an order enjoining the wrongful conduct alleged herein;

(f)    For other appropriate injunctive and other equitable relief;

(g)    For costs;

(h)    For pre-judgment and post-judgment interest as provided by law;

(i)    For attorneys' fees under the account contracts, the common fund doctrine, and all other applicable rules and law; and

(j)    For such other relief as the court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  June 21, 2022                          Respectfully submitted,

                                                **BURSOR & FISHER, P.A.**

                                                By:   _/s/ L. Timothy Fisher_
                                                       L. Timothy Fisher

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*Pro hac vice* Forthcoming)
Julian C. Diamond (*Pro hac vice* Forthcoming)
888 Seventh Ave, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: pfraietta@bursor.com
          jdiamond@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT 1**

# United States Senate

WASHINGTON, DC 20510

April 26, 2022

Al Ko
Early Warning Services, LLC
16552 N 90th St
Scottsdale, AZ 85260

Dear Mr. Ko,

We write regarding disturbing reports of a rise in fraud and scams on your online peer-to-peer money transfer platform Zelle, and the ongoing failure by Zelle or the banks that own this service to address these scams and provide appropriate redress to defrauded consumers. This "widespread fraud" on money transfer apps has affected nearly 18 million Americans.[1] Given the rise of increasingly sophisticated scams on your platform and the widely documented difficulties consumers have faced in seeking relief from banks, we seek to understand the extent to which Zelle allows fraud to flourish and the steps your company is taking to increase consumer protection and help users recover lost funds.

After its introduction in 2017, Zelle exploded in popularity, in large part because its connections to large financial institutions allowed it to sell itself as "fast, free, and ubiquitous."[2] Your company, Early Warning Services, LLC is owned by seven of the country's biggest banks, including JP Morgan Chase & Co., Bank of America, and Wells Fargo, giving consumers the convenience of an integrated platform and providing an implicit promise that activity on the platform is as secure as activity at the bank teller window.[3] In 2021, Zelle "drove $490 billion in transactions, more than double Venmo's $230 P2P volume."[4]

The increased activity on Zelle is putting millions of consumers at risk as fraud flourishes:

> Police reports and dispatches from industry analysts make it clear that the network has become a preferred tool for grifters like romance scammers, cryptocurrency con artists, and those who prowl social media sites advertising concert tickets and purebred puppies — only to disappear with buyers' cash after they pay.[5]

---

[1] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.
[2] New York Times, "Cash Faces a New Challenger in Zelle, a Mobile Banking Service," Stacy Cowley, June 12, 2017, https://www.nytimes.com/2017/06/12/business/dealbook/mobile-banking-zelle-venmo-apple-pay.html.
[3] Early Warning Services, LLC, website accessed Apri 25, 2022, https://www.earlywarning.com/about; New York Times, "Cash Faces a New Challenger in Zelle, a Mobile Banking Service," Stacy Cowley, June 12, 2017, https://www.nytimes.com/2017/06/12/business/dealbook/mobile-banking-zelle-venmo-apple-pay.html.
[4] American Banker, "Can Zelle change the narrative around P2P fraud?," Kate Fitzgerald, March 9, 2022, https://www.americanbanker.com/payments/news/can-zelle-change-the-narrative-around-p2p-fraud.
[5] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

Reports of consumers losing thousands of dollars have come out of California,[6] Massachusetts,[7] and Georgia.[8] These scams, many of which involve a scammer creating a Zelle account linked to the consumer's own phone number, have cost victims their life savings and robbed them of funds essential to their small businesses, further underscoring the consequences of this widespread fraud.[9]

Alarmingly, both your company and the big banks who both own and partner with the platform have abdicated responsibility for fraudulent transactions, leaving consumers with no way to get back their funds. Zelle's biggest draw – the immediacy of its transfers – also makes scams more effective and "a favorite of fraudsters," as consumers have no option to cancel a transaction even moments after authorizing it.[10] And banks have chosen to let consumers suffer, blaming them for authorizing fraudulent transactions.[11] According to Consumer Watchdog, banks were essentially "throw[ing] up their hands and say 'it's not our problem because you authenticated it.'"[12] A former executive at your company even argued that banks have not done enough to deter fraud on Zelle, warning that banks had not sufficiently educated consumers about the risks.[13] One customer observed that "it's like the banks have colluded with the sleazebags on the street to be able to steal."[14]

The policies of your company and the banks that own and operate on it create a confusing and unfair environment for consumers, who are already facing "rampant" and sophisticated threats from spammers on the platform.[15] The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money transfers, including those who were "induced" into transferring the money themselves,[16] while the FDIC issued a report in March 2022 finding that both the banks and the platform – in

---

[6] ABC 7 News, "LA woman loses over $18K through 'Zelle' after scammers text, call her pretending to be bank," Carlos Granda, March 12, 2022,  https://abc7.com/los-angeles-zelle-scam-text-message/11644167/.

[7] Boston 25 News, ""They're not robots talking to you. They're actual people." Zelle app users warn of latest scams," Chris Flanagan, March 23, 2022, https://www.boston25news.com/news/massachusetts/theyre-not-robots-talking-you-theyre-actual-people-zelle-app-users-warn-latest-scams/WJZVXE23JZFCTPBD5XOPZZXF6I/.

[8] WBS-TV, "Zelle warns about scams, says it's not responsible for funds stolen through app," Ashli Lincoln, March 28, 2022,  https://www.wsbtv.com/news/local/zelle-warns-about-scams-says-its-not-responsible-funds-stolen-through-app/ZTCNAVOTTNG5RNTAOAXPWELXB4/.

[9] *Id.*

[10] KARE 11, "Two Minnesota women were tricked by the same scam on Zelle, here's how you can protect yourself," Gordon Severson, March 22, 2022, https://www.kare11.com/article/money/minnesota-women-tricked-by-the-same-scam-on-zelle-heres-how-you-can-protect-yourself/89-3016a498-c8db-407a-ab1f-632f24204d9a; New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[11] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[12] ABC 7, "Calif. woman loses over $18K through 'Zelle' after scammers text, call her pretending to be bank," Carlos Granda, March 14, 2022, https://abc7news.com/zelle-scam-electronic-withdrawals-bank-of-america/11650620/.

[13] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[14] *Id.*

[15] *Id.*

[16] Boston 25 News, ""They're not robots talking to you. They're actual people." Zelle app users warn of latest scams," Chris Flanagan, March 23, 2022, https://www.boston25news.com/news/massachusetts/theyre-not-robots-talking-you-theyre-actual-people-zelle-app-users-warn-latest-scams/WJZVXE23JZFCTPBD5XOPZZXF6I/.

this case Zelle – were held responsible for fraudulent electronic transfers through Regulation E.[17] Given this regulatory landscape, your company and the banks have a clear responsibility to more aggressively protect consumers.

In order to better understand how consumers have experienced fraud on your platform we ask that you provide answers to the following questions by May 10, 2022:

1. What are the procedures for rooting out scams on the online platform Zelle, and how has your company adjusted those procedures in light of "rampant […] organized crime"[18] on the platform?
2. What are Zelle's policies for determining which consumers receive refunds for fraudulent claims?
   a. Is this a joint process with the account holders' bank? If so, are these procedures standardized across all banks and financial institutions using the platform?
3. Does Regulation E of the Electronic Fund Transfers Act apply to the scams seen regularly on Zelle, including those that involve consumers induced into authorizing fraudulent transfers?
   a. Under Regulation E, would Early Warning Services, LLC or the account holders' bank be responsible for refunding the funds?
4. How many reports of fraud from Zelle customers have Early Warning Services received for each of the last five full calendar years, and from January 1, 2022, to the present?  For each year, and for the period from January 1, 2022, to the present, please provide:
   a. The total number of reported cases of fraud from Zelle customers.
   b. The total dollar value of reported fraud.
   c. The number of cases where Zelle provided refunds to customers.
   d. The total value of these refunds.
   e. The number of cases where Zelle referred fraud to law enforcement or to federal or state bank regulators,

Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

Robert Menendez
United States Senator

---

[17] Consumer Finance Monitor, "FDIC Consumer Compliance Supervisory Highlights looks at unauthorized EFTs, overdraft programs, re-presentment of unpaid transactions, and fair lending," John L. Culhane, Jr., April 7, 2022, https://www.consumerfinancemonitor.com/2022/04/07/fdic-consumer-compliance-supervisory-highlights-looks-at-unauthorized-efts-overdraft-programs-re-presentment-of-unpaid-transactions-and-fair-lending/.

[18] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.